IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

DECEMBER SESSION, 1994

FILED

December 19, 1995

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE | ) | |
| | ) | |
| APPELLEE | ) | |
| | ) | NO. 01C01-9406-CR-00185 |
| | ) | |
| | ) | DAVIDSON COUNTY |
| V. | ) | |
| | ) | HON. J. RANDALL WYATT, JR. |
| | ) | JUDGE |
| | ) | |
| | ) | (Felony Murder; Especially |
| | ) | Aggravated Robbery) |
| GREGORY K. JONES | ) | |
| | ) | |
| APPELLANT | ) | |


FOR THE APPELLANT:

Michael V. Thompson
Attorney at Law
Suite 315, 150 Second Ave., N.
Nashville, TN 37201

FOR THE APPELLEE:

Charles W. Burson
Attorney General

Cecil H. Ross
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN 37243-0493

Victor S. Johnson, III
District Attorney General

Tom Thurman
Katrin Miller
Asst. Dist. Attorneys General
102 Metro Courthouse
Nashville, TN 37201


AFFIRMED


OPINION FILED:_____


JERRY SCOTT, PRESIDING JUDGE

# **O P I N I O N**

The appellant was convicted of felony murder and especially aggravated robbery. He was sentenced to life imprisonment for the murder and for the especially aggravated robbery, the appellant received a fifteen-year sentence which was ordered to be served consecutively to his life sentence. He appeals as of right presenting the following issues:

(1) Whether the trial court erred in admitting the transcript of prior testimony of David Shelton as substantive evidence against the Appellant?

(2) Whether certain of the prosecutor's statements made during closing argument were unsupported by the evidence and highly prejudicial to the Appellant such that they constituted plain error?

(3) Whether the evidence adduced at trial was sufficiently corroborative of the incriminating testimony of the alleged accomplice, David Shelton?

(4) Whether the evidence is sufficient to support the Appellant's convictions beyond a reasonable doubt?

## FACTS

At approximately 4:00 a.m. on the morning of May 6, 1991, Craig Alexander was leaving the Steak and Ale Restaurant in Nashville, Tennessee where he was the manager. Mr. Alexander, along with his wife, their child, and the assistant manager, were accosted by a young black male who pulled a gun and ordered them to freeze. As Mr. Alexander lunged for the gun, one shot was fired killing him instantly.

David Shelton pleaded guilty to this murder and received a sixty-year sentence. As part of the plea bargain, Mr. Shelton agreed to testify against the appellant; however, prior to trial, he advised the state that he was going to refuse to testify for fear of retaliation by other inmates. At a pre-trial hearing held out of the presence of the jury before the trial started, Mr. Shelton acknowledged that he had been truthful when he testified under oath as to the appellant's involvement in the crime; however, he had since become concerned for his safety should he be regarded in prison as a "snitch." Upon being questioned

2

about his reluctance to testify at trial, the following dialogue occurred:

A.    Well, when you're--when you're in a-- in a prison or whatever, and you get regarded or get labelled as a snitch, then, therefore you get-- put your life on the line.  So--
Q.    Okay.
A.    That's why I feel reluctant.
Q.    And who advised you that?
A.    Who advised me of what?
Q.    Where have you found out about being a snitch, what happens to you?
A.    I've seen it.  I've seen it.
Q.    Have you had any specific threats made to you?
A.    Well, indirect, but you know --
Q.    Direct or indirect threats?
A.    Yeah
Q.    Not by this defendant.
A.    No.

When the prosecutor referred to the possibility of transferring Mr. Shelton to another correctional facility for protection against the appellant, Mr. Shelton responded:

"[w]ell, I don't think it's -- it's -- it's against Mr. Jones, you understand.  It's against any facility any facility.  When they -- when you have a jacket put on you, something in your jacket, ain't no telling who gets that jacket and there ain't no telling who runs their mouth.  I mean guards in an institution do the same thing, you understand.  So you're not just guarding me from Mr. Jones or --or-- or if you transfer me to another facility, out of state.  Even out of state, you know, what I'm saying.  Something still could happen.  You know, it's not a guarantee that I'll be protected."

Near the end of the jury-out hearing, the judge told Mr. Shelton that he would  be held in contempt of court if he refused to testify.  The trial judge explained that contempt carries a $50.00 fine and a ten-day jail sentence. Recognizing that the threat of a fine and ten days in jail would hardly persuade an impecunious prisoner serving a sixty year prison sentence to do anything, the trial judge added that he thought being held "continuously in contempt" would affect other aspects of Mr. Shelton's incarceration including his "good and honor time, and whatever else would  have to do with [his] being paroled at some point."  However, the trial judge insisted that he was "not trying to force the truth or force something that wouldn't be true, just to be insisting on [Mr. Shelton] testifying, but [he was] trying to be fair."  Moreover, the judge directed the

witness' attorney to look into the possible repercussions for his incarceration and to discuss that with him.

Immediately before the trial began, a second jury-out hearing was held at which Mr. Shelton was asked questions by counsel for both parties. He testified under oath that the appellant was with him when he killed the victim, that the appellant had planned the robbery and provided the gun. On cross-examination, Mr. Shelton admitted that, earlier, he had told the defense attorney that he had gotten the gun from some guy who owed him money for cocaine. He said he did not remember what the appellant's part in planning the robbery was; however, on redirect, he said that the appellant provided information on the closing times and procedures at the Steak and Ale as the appellant had worked at the restaurant. Mr. Shelton also testified on redirect that the gun obtained as a result of the drug transaction was not the one given him by the appellant though he acknowledged on recross that he had previously told the defense attorney that the murder weapon was the gun that he had obtained for cocaine.[1] After direct, cross, redirect, and recross examination, Mr. Shelton was being questioned on re-redirect when he adamantly refused to "answer anymore questions, anymore questions, period."

The trial judge found that the direct, cross, redirect and recross examinations of Mr. Shelton from the second jury-out hearing were admissible pursuant to Rule 804(b)(1), Tenn.R.Evid. However, the judge agreed that all testimony subsequent to the recross examination failed to meet the 804(b)(1) standard.[2] At trial, when Mr. Shelton refused to answer any questions, the jury was read the transcript of the pre-trial hearing which consisted of the testimony outlined in the preceding paragraphs.

---

[1]The murder weapon given to him by the appellant was a .32 caliber. The weapon he received in the drug transaction was a .38 caliber.

[2]To be admissible under Rule 804(b)(1), the party against whom former testimony is offered must have had both an opportunity and a similar motive to develop the testimony by direct, cross, or by redirect examination.

4

Once the trial began, the state began its case with the testimony of Rhonda Alexander, the wife of the victim. She said that she, her husband and their four-year old daughter were leaving the Steak and Ale around 4:00 a.m. when a man with a gun appeared first telling them to freeze, after which he shot her husband. Ms. Alexander testified that she did not recognize the man who shot her husband and could only say that he had on a light-colored shirt. However, she knew the appellant as someone who had been employed at Steak and Ale under her husband's management.

The state's next witness, Sean Dean, was also an employee at the Steak and Ale. He witnessed the murder as he was leaving the restaurant during the early morning hours of May 6, 1991 with the victim and his family. At trial, he testified that the gunman had on a hat, an off white shirt and dark pants. He identified a shirt presented to him by the prosecutor as one which would be consistent with that worn by the perpetrator.

The state called two witnesses who were in the vicinity of the Steak and Ale at the time the crime occurred. Michael Scott Hambrick was talking with a friend in a parking lot adjacent to the Steak and Ale on the morning of the murder when he heard a gunshot. Moments later, he saw two black males running away from the Steak and Ale. He testified that one of the men had on a "white garment, like a shirt." He could not identify the appellant as one of the men whom he had seen on that night.

Another witness, Mark Gunn, was on his way to a gas station at approximately 3:50 in the morning when he saw two black males who were in their early twenties standing at each side of the front door of the Steak and Ale facing one another. He testified that one of the men was around 5'8" and the other, who had on a white shirt, was shorter. The taller individual was wearing red and carried what appeared to be a backpack. At trial, Mr. Gunn testified that

5

the appellant appeared similar in height and skin tone to the shorter man he saw on the night of the crime; however, he could not say that the appellant was the same man.  Subsequent to reporting  what he had seen to the police, Mr. Gunn was shown two to three hundred photographs of black males in photographic lineups.  He never recognized any of the men's pictures and, on cross-examination, he testified that approximately 75 of these men had skin tones similar to the appellant.

The state's next witness was a former temporary roommate of the appellant's.  He said that he and the appellant had worked together at a Longhorn Steak restaurant and had lived together for a few weeks around the end of March and the first part of April of 1991. He identified the bag which was found near the scene of the crime as one which had been in the closet of his bedroom at their apartment; however, he did not know to whom the bag belonged.  Utilizing an aerial photograph, he also showed the jury a trail which is a shortcut from their apartment to the Steak and Ale.

Linda Lakip, a former girlfriend of the appellant's, was the state's next witness.  She said they had been romantically involved around 1983 and had since become only friends.  Ms. Lakip testified that six months after the murder, the appellant talked with her.  He told her that David Shelton had committed the murder and that his own gun had disappeared about the time of the crime.  He also told her that Mr. Shelton had questioned him regarding the closing procedures of the Steak and Ale restaurant just three to four weeks prior to the murder, but he did not know why.  When she confronted him about his own participation in the crime, Ms. Lakip said that the appellant denied any involvement.

Several police officers testified at trial regarding the evidence recovered from the crime scene.  One investigator who was called to the scene of the crime

6

testified as to several items that were found in a grassy wooded area behind the Steak and Ale. Among the items were a pistol, a duffel bag with a pair of scissors inside, one brown glove, and black jogging pants. Testimony from another police officer revealed that the gun they found was a .32 caliber Smith and Wesson. The gun was loaded with six bullets, one of which had been fired. An employee of the Tennessee Bureau of Investigation Crime Laboratory testified at trial that it was his opinion that the bullet recovered from the body of the victim had been fired from the .32 caliber Smith and Wesson revolver found at the crime scene. Another police officer testified that his dog tracked a human scent from beside the Steak and Ale to the parking lot of the Castile Apartment complex which is where the appellant and Mr. Shelton shared an apartment. The complex was located directly behind the Steak and Ale restaurant.

At trial, police detective Johnny Lawrence testified about an interview he had with the appellant after obtaining suspicious information from Ms. Lakip. The appellant's statement was recorded on audio tape, and the tape was played for the jury. In the interview, the appellant revealed that his then roommate, Mr. Shelton, had implicated himself as the murderer in a conversation with the appellant on the day following the crime. The appellant said that Mr. Shelton often wore sweat pants and sweat shirts. When shown a photograph of some sweatpants found at the crime scene, the appellant responded that he had seen them before and added that they were turned inside out in the picture.

In a May 14, 1992 interview with another police detective, Larry Flair, the appellant said that he first learned of the crime on Sunday morning from the manager of the Longhorn Steak house where he was employed. He also told the detective that he read about the crime in the Sunday paper and saw it on the

7

news Sunday evening.  Later on Sunday evening, Mr. Shelton returned to the apartment he shared with the appellant and confessed that he had been the murderer in the Steak and Ale incident.  Soon afterward, Mr. Shelton moved away from town.

Mr. Flair testified that he became suspicious of the appellant because the murder occurred too late to have been reported in the Sunday paper.   He, therefore, interviewed the appellant again the following day.  In the second interview, the appellant stated that he was awakened by Mr. Shelton between 4:00 and 4:30 on Sunday morning, May 6, 1991. He was wet and wore only black gym shorts and shoes.  Mr. Shelton told the appellant that he had "fucked up."  He also told the detective that Mr. Shelton had asked him details about the closing procedures at the Steak and Ale.  He responded that he recognized some of the clothing recovered from the crime scene as Mr. Shelton's, as Mr. Shelton owned very little clothing.  He also recognized the blue duffel bag as belonging to Mr. Shelton.  He admitted that the scissors found at the crime scene were his own.  The appellant said that he told his girlfriend, Tammy Donnelly, about the crime and that they decided she should call Crime Stoppers.

Darren Williams, another prosecution witness, met and became a roommate of Mr. Shelton's several months after the murder.  Upon learning from a television report that Mr. Shelton was wanted by the authorities for questioning, Mr. Williams confronted Mr. Shelton.  Mr. Shelton admitted that he shot the victim at the Steak and Ale.  He also  told Mr. Williams that the appellant was with him.  The trial judge instructed the jury that Mr. Williams' testimony about the statement by Mr. Shelton was not to be considered substantively but was only offered to show why the police arrested Mr. Shelton.

8

The appellant offered no proof in this case.

## I.

First, we address the appellant's contention that the trial court erred by admitting the transcript of the prior testimony of Mr. Shelton as substantive evidence against him. The appellant concedes that the testimony of Mr. Shelton technically meets the requirements of Rule 804(b)(1), Tenn.R.Evid., the hearsay exception for former testimony. It is the appellant's position, however, that due to "the coercive atmosphere in the courtroom," the testimony had no probative value and its admission was plain error.

The appellant bases his argument upon the trial judge's references to contempt as well as his suggestion that aspects of the appellant's incarceration might be adversely affected should he refuse to testify, as heretofore outlined. In addition, the appellant mentions that the trial judge told Mr. Shelton that he could be subject to a perjury prosecution if he testified to a falsehood under oath.

Initially we note that the trial judge was merely candidly disclosing to Mr. Shelton the consequences of his actions. As discussed above, the judge explained the effect of a contempt ruling at the request of defense counsel. The appellant cited no authority to support his claim that the transcript of Mr. Shelton's testimony should have been excluded because the atmosphere was coercive in the courtroom. Therefore, this issue was waived. See Rules of the Court of Criminal Appeals 10(b) (providing that issues in appellate briefs which are not supported by citation to authority are to be treated as waived by this Court); see also, State v. Killebrew, 760 S.W.2d 228, 231 (Tenn. Crim. App. 1988). Of course, the reason no authority was cited is that apparently none exists. A coercive courtroom atmosphere might affect the credibility of the absent witness' prior testimony, but not its admissibility. This issue has no merit.

9

**II.**

In the appellant's next issue, he asserts that the state improperly referenced Mr. Shelton's refusal to testify during closing argument creating an inference that the appellant had threatened Mr. Shelton. It is the appellant's position that these statements are prejudicial and constituted plain error. The relevant portion of the prosecutor's argument which was the basis for the complaint and the defense attorney's ensuing objection was as follows:

> And he wants to say, well, why didn't he testify? Well, he did testify. He testified under oath on you heard two different occasions, under the threat of perjury. He testified. Why wouldn't he testify in here? Just ask yourself, use your common sense. Sixty years is hard to do looking at your back. For some strange reason, you're not a snitch unless you testify before you twelve people. He won't be labelled a snitch possibly in the penitentiary. He won't get shanked while he's walking down the hall to go to the bathroom.
>
> MR. THOMPSON: Your Honor, I -- I'm sorry. I've got to object to that. I just think that's not fair. There -- there's no proof in the record regarding this.
>
> THE COURT: That will be sustained. There's nothing in the record to that effect. He's arguing his case, and I can understand that he can argue his theory. And I'll give you that, but let's move on back to, you know, what we're here about, more than what could happen.

Earlier in the proceedings, the trial judge made it clear that the state should refrain from any discussion which might imply that the appellant had threatened Mr. Shelton.[3]

This Court has previously expressed its opinion that it is "elementary knowledge to every practicing attorney" that "matters discussed in jury-out hearings are not commented upon before the jury." State v. Elliott, 703 S.W.2d 171, 177 (Tenn. Crim. App. 1985). Additionally, we have condemned prosecutors for misstating the evidence and misleading the jury as to the inferences it may draw. See, e.g., State v. Philpott, 882 S.W.2d 394, 408

---

[3]Concerning Mr. Shelton's apprehension about being labeled a "snitch," the trial judge said, "I don't think that ought to be coming in here, that he's been threatened because no matter how you look at that, that will be interpreted as if this man threatened him."

(Tenn. Crim. App. 1994) (encouraging trial judges to "harness undisciplined, blatant transgressions by counsel"). The prosecutor in this case certainly was aware of the trial court's determination that nothing was to be presented to the jury which might inaccurately imply that the appellant had threatened Mr. Shelton. However, to find that the prosecuting attorney's words created such an inference would be mere speculation. Indeed, it appears that his argument was an appeal to the jurors' common sense about life in the penitentiary rather than an attempt to suggest felonious behavior by the appellant. See generally, State v. Brown, 795 S.W.2d 689, 696 (Tenn. Crim. App. 1990) (upholding as proper a prosecutor's closing argument that "the jury should consider the evidence in light of human experience and common sense.") While we cannot condone the prosecutor's disregard for the trial judge's directions , there is nothing in the record to indicate that his conduct was intentional. In light of the foregoing facts and authorities, we do not find that the attorney's reference to Mr. Shelton's concern was reversible error. This issue has no merit.

## III.

Next, the appellant claims that the evidence adduced at trial was not sufficiently corroborative of the incriminating testimony of the alleged accomplice, Mr. Shelton. It is well established that, in Tennessee, a conviction may not be based upon the uncorroborated testimony of an accomplice. State v. Bigbee,  885 S.W.2d 797, 803 (Tenn. 1994); Monts v. State, 379 S.W.2d 34, 43 (Tenn. 1964). Whether a witness' testimony has been sufficiently corroborated is a matter entrusted to the jury as the trier of fact. Id. In Bigbee,

the Tennessee Supreme Court recently discussed the nature of the rule as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it;  and this independent

11

corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

885 S.W.2d 803 (quoting this Court's opinion in State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992).

This is not a case in which there was overwhelming convicting evidence. However, as noted, there need only be "slight corroboration." In this case, there was testimony that a duffel bag found at the crime scene was seen earlier at the appellant's home by a temporary roommate. The appellant himself said that he recognized the bag as one which belonged to Mr. Shelton. The appellant also testified that the scissors found at the scene of the crime were his. There was testimony from a former girlfriend of the appellant's, as well as from the appellant, that he had discussed the closing times of the Steak and Ale restaurant with Mr. Shelton. While the appellant offered as an explanation for these suspicious bits of evidence the fact that Mr. Shelton was his roommate, the jury was entitled to infer an inculpatory meaning from them. Finally, the appellant's inconsistent statements to the police concerning when and under what circumstances he first saw Mr. Shelton after the crimes was evidence that his exculpatory statements were not accurate. Because these facts legitimately connected the appellant to the commission of this crime, the incriminating testimony of the accomplice, Mr. Shelton, was sufficiently corroborated. This issue has no merit.

## IV.

In his final issue, the appellant contests the sufficiency of the convicting evidence. The principles which govern this court's review of a conviction by a

jury are well established. This court must review the record to determine if the evidence adduced at trial was sufficient "to support the finding of the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to determinations of guilt predicated upon direct evidence, circumstantial evidence, or a combination thereof. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A jury verdict of guilty, approved by the trial judge, accredits the testimony of the state's witnesses and resolves all conflicts in favor of the theory of the state. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978). On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Moreover, a verdict against the appellant removes the presumption of innocence and raises a presumption of guilt on appeal, State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973), which the appellant has the burden of overcoming. State v. Brown, 551 S.W.2d 329, 330 (Tenn. 1977).

In examining the sufficiency of the evidence, this court does not reevaluate the weight or credibility of the witnesses' testimony as these are matters entrusted exclusively to the jury as the triers of fact. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Wright, 836 S.W.2d 130, 134 (Tenn. Crim. App. 1992). Nor may this court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). The relevant question on appeal is whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have determined that the essential elements of the crime were established beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 314-324, 99 S. Ct. 2781, 2786-2792, 61 L. Ed. 2d 560 (1979).

13

In this case, the jury, the exclusive arbiter of credibility, obviously believed the testimony of Mr. Shelton which implicated the appellant. As discussed in the preceding issue, there was sufficient evidence which corroborated the accomplice testimony. Any rational trier of fact could have determined that the appellant was guilty beyond a reasonable doubt. This issue has no merit.

Finding no merit to any issue, the judgment is affirmed.


_____
JERRY SCOTT, PRESIDING JUDGE


CONCUR:


_____
JOE B. JONES, JUDGE


_____
PAUL G. SUMMERS, JUDGE